E-FILED
Monday, 31 March, 2008  01:50:21 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

**DEL EVANS,**
   **Plaintiff,**

    **v.**           **No. 07 CV 3092**

**ROGER ZIMMERMAN and**
**LOWELL BROWN**
   **Defendants.**

## MEMORANDUM OPINION AND ORDER

Before the court are three motions for summary judgment: 1) the defendant, Roger Zimmerman's summary judgment motion [13], the plaintiff's response [18] and Zimmerman's reply [20]; 2) the defendant, Roger Zimmerman's unopposed summary judgment motion [24]; and 3) Dr. Lowell Brown's unopposed summary judgment motion [26].

### Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 17, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge

may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

## Background

The plaintiff, Del Evans, #R12300, is currently incarcerated at Western Illinois Correctional Center. Plaintiff filed a 42 U.S.C. §1983 complaint on April 19, 2007 alleging that Defendant was deliberately indifferent to his medical needs in violation of the Eighth Amendment for failure to provide Plaintiff with access to medical care for a sexually transmitted disease. [7]. Plaintiff claims that he was diagnosed with gonorrhea by an unnamed physician at Stateville Correctional Center on November 18, 2006 and was provided with a prescription. (Complaint, p. 5, ¶ F). Upon Plaintiff's transfer to Western Illinois Correctional Center on December 5, 2006, he asserts that his symptoms worsened and remained untreated, although he was seen by a nurse on December 6, 2007 (Complaint p. 6, ¶ K) and December 10, 2006 (Complaint p. 6, ¶ L), and was seen by a doctor on December 18, 2006 (Complaint p. 7, ¶ Q), and received medication on December 23, 2006 (Complaint p. 7, ¶ R). Plaintiff claims that the course of treatment prescribed by the doctor is ineffective (Complaint p. 7, ¶ S) and as a result he continues to suffer from gonorrhea and its side effects. (Complaint, p. 9, ¶ Z). Plaintiff claims that he has filed numerous grievances regarding his medical care and treatment. (Complaint, pp. 3-4). Plaintiff claims he received a disciplinary ticket in retaliation for seeking the relief and care he needed. (Complaint, p. 4, ¶ G). Plaintiff seeks the following relief: 1) injunctive relief in the form of medical treatment; 2) compensatory relief for his litigation costs; 3) compensatory relief of $100,000 for future medical treatment; 4) compensatory damages of $1,000,000 for injuries, pain, and suffering; 5) nominal damages of $1,000,000 for Plaintiff's constitutional injury; 6) actual damages for litigation costs; 7) actual damages of $1,000,000 for the injuries to his body, and 8) punitive damages of $2,000,000 for the reckless disregard of Plaintiff's rights. (Complaint pp. 14-15).

In his motion for summary judgment [13], Zimmerman asserts that the plaintiff failed to exhaust his administrative remedies prior to filing this lawsuit. In an affidavit by Sherry Benton, she advises the court that the Administrative Review Board had never received any correspondence from the plaintiff, including grievances or appeals of grievances. In response [18] plaintiff advises the court that he did exhaust administrative remedies and corrobates his assertion with a copy of his grievance. His grievance indicates that he has exhausted administrative remedies as to his complaint regarding gonorrhea, but not atopic dermatitis. Therefore, Zimmerman's motion for summary judgment [13] is granted in part as to the plaintiff's complaint regarding atopic dermatitis, but is denied as to the treatment of the gonorrhea.

In his second summary judgment motion [24], Zimmerman Defendant denies that he was deliberately indifferent to Plaintiff's medical needs. Defendant further denies that his actions or

2

that his reliance on the opinion and judgment of medical professionals constituted a deliberate indifference to Plaintiff's medical needs. Defendant asserts that Plaintiff has also failed to prove that Defendant violated his Eighth Amendment rights. Plaintiff's dissatisfaction with the medical care he received, and continues to receive, does not constitute deliberate indifference to his medical needs. Plaintiff has no evidence to support his claims of deliberate indifference by this Defendant. Plaintiff failed to support any claim that Defendant Zimmerman retaliated against Plaintiff and admitted that Defendant did not retaliate against him.

   Brown argues that he is entitled to summary judgment as a matter of law with respect to the Plaintiff's claims. He asserts that Dr. Brown was not personally involved in the Plaintiff's care and treatment until December 18, 2006. When Dr. Brown first saw the Plaintiff on December 18, 2006, he prescribed an antibiotic for him. When Dr. Brown first saw the Plaintiff on December 18, 2006, he took laboratory samples, the results of which were negative for gonorrhea. Second, Plaintiff's disagreement with how Dr. Brown exercised his medical judgment does not create a constitutional violation. Prior to prescribing hydrocortisone to the Plaintiff for his face, the Plaintiff was instructed to wash his face and to not squeeze his pimples. The Plaintiff's deposition testimony demonstrates that he did not follow this advice. Thus, hydrocortisone was later prescribed to treat the Plaintiff's face. Third, if a medical doctor must now provide patients who are prisoners with whatever treatment they request, when they request it, and without question, regardless of whether the treatment is medically appropriate, that was not the law at the time of the events alleged here. For these reasons, Dr. Brown asks that the court grants him summary judgment.

### Material Facts Claimed To Be Undisputed[1]

1.  The material facts began shortly before his latest incarceration while the Plaintiff was still out on parole. Transcript of Plaintiff's deposition ("Transcript") at page 9 lines 5-8.
2.  Following a sexual encounter one night while drinking, the Plaintiff had a cold sore and painful urination, so he went to the clinic to find out whether he had acquired a sexually transmitted disease ("STD"). Transcript at page 10, line 24 through page 11, line 25.
3.  The Plaintiff did not go to the clinic until a few days after noticing the symptoms though. Transcript at page 15, line 20 through page 16 line 1.
4.  At the clinic, the Plaintiff's urine was tested and the results of the test were sent to him a few days later. Transcript at page 9 lines 14-20; page 16 lines 2-5.
5.  When he finally received them, the results showed that the Plaintiff tested positive for gonorrhea. Transcript at page 9 lines 1-22.
6.  The Plaintiff was still on parole when he tested positive for gonorrhea. Transcript at page 9 lines 9-11.

---

[1]Exhibits are attached to Brown's summary judgment motion [26], unless otherwise noted. Further, the court reviewed Zimmerman's Undisputed Material Fact [25]s, but only listed those that were necessary to reach its decision.

7.  The Plaintiff received his test results back from the clinic on a Thursday.  Transcript at page 10 lines 13-14.

8.  On Friday, after an altercation with his girlfriend, the Plaintiff was taken to the police station where he spent the night. Transcript at page 10 lines 13-19.

9.  By Saturday morning, November 18, 2006, the Plaintiff was back in prison at Stateville Correctional Center. Transcript at page 8 lines 17-22; page 10, lines 16-20.

10.  When the Plaintiff arrived at Stateville, he told staff that he might have gonorrhea. Transcript at page 10, lines 21-23.

11.  This is not the first time that the Plaintiff has had gonorrhea.  Transcript at page 12 lines 19-21.

12.  The Plaintiff is not a doctor, however.  Transcript at page 13 line 23 through page 14  line 1.

13.  The Plaintiff is not a nurse either.  Transcript at page 13 line 23 through page 14 line 1.

14.  The Plaintiff is not an emergency medical technician. Transcript at page 13 line 23 through page 14 line 1.

15.  The Plaintiff has never taken a CPR class.  Transcript at page 13 line 23 through page 14 line 1.

16.  In fact, the Plaintiff has no medical training in all.  Transcript at page 13 line 23 through page 14 line 1.

17.  When the Plaintiff arrived at Stateville Correctional Center he told them that he had gonorrhea.  Transcript at page 16 lines 11-13.

18.  The Plaintiff stayed at Stateville Correctional Center from November 18, 2006 until December 5, 2006.  Transcript at page 18 lines 5-6.

19.  While at Stateville Correctional Center, the Plaintiff was seen by a doctor.  Transcript at page 16 lines 14-16.

20.  Dr. Brown does not work at Stateville Correctional Center. Transcript at page 18 lines 18-19.

21.  Dr. Brown is a physician, however. Affidavit of Dr. Brown ("Brown Affidavit"), ¶1.

22.  Dr. Brown is also a doctor for prisoners who are in the custody of the Illinois Department of Corrections. Brown Affidavit, ¶ 2.

23.  Dr. Brown has chosen as his patients individuals that society has locked away.  Brown Affidavit, ¶ 2.

24.  The Department prefers that prisoners be referred to as "offenders." Brown Affidavit, ¶ 3.

25.  In 1956, Dr. Brown received a Bachelor of Arts degree in Biology from Stanford University.  Brown Affidavit, ¶ 4.

26.  Dr. Brown's studies of biology were only the beginning of his education, however. Brown Affidavit, ¶ 5.

27.  Dr. Brown continued his education for many more years, starting with medical school, followed by an internship, then a residency, and later a lifetime of continuing education and hands-on experience. Brown Affidavit, ¶ 6.

28.  In 1960, Dr. Brown received his Doctor of Medicine (M.D.) degree from Creighton University School of Medicine in Omaha, Nebraska. Brown Affidavit, ¶ 7.

29.  Dr. Brown completed his internship at Santa Clara County Hospital. Brown Affidavit, ¶ 8.

4

30.     Dr. Brown's residency was completed in Modesto, California. Brown Affidavit, ¶ 9.

31.     For a time, Dr. Brown worked in the private sector as a physician in the state of California. Brown Affidavit, ¶ 10.

32.     Dr. Brown then chose to serve his country in the United States Navy, where he served as a physician providing medical services to sailors and Marines. Brown Affidavit, ¶ 11.

33.     Dr. Brown served his country as a physician in the United States Navy for 12 years. Brown Affidavit, ¶ 11.

34.     After serving in the United States Navy, Dr. Brown moved to Springfield, Illinois. Brown Affidavit, ¶ 12.

35.     Dr. Brown is licensed to practice medicine in the State of Illinois, and he has been licensed to practice medicine in all its branches in the state of Illinois since 1979.  Brown Affidavit, ¶ 13.

36.     Dr. Brown's qualifications include being board certified in anatomic and clinical pathology.  Brown Affidavit, ¶ 14.

37.     Dr. Brown also has extensive experience caring for the sick and injured in the hospital emergency department setting.  Brown Affidavit, ¶ 15.

38.     Dr. Brown practiced medicine in Springfield, Illinois for many years, first as a pathologist and later as a family practitioner.  Brown Affidavit, ¶ 16.

39.     Dr. Brown retired from his medical practice in Springfield in the year 2000.  Brown Affidavit, ¶ 17.

40.     Dr. Brown then returned to California, where he began practicing medicine in the prison setting.

41.     After practicing medicine as a prison doctor in California for some time, Dr. Brown came back to Illinois.  Brown Affidavit, ¶ 18.

42.     In January 2004, after his return to Illinois, Dr. Brown began working at the Western Illinois Correctional Center as a physician.  Brown Affidavit, ¶ 19.

43.     Since January 2004, Dr. Brown has been serving as the Medical Director at the Western Illinois Correctional Center.  Brown Affidavit, ¶ 20.

44.     A prison doctor's patients are in prison because they have committed offenses against society and a court has sentenced them to time behind bars.  Brown Affidavit, ¶ 21.

45.     Not surprisingly, a prison doctor's patients are not the easiest to treat.  Brown Affidavit, ¶ 22.

46.     Many offenders enter prison with conditions that have been left untreated for years. Brown Affidavit, ¶ 23.

47.     Often offenders did not have access to health care services prior to entering prison. Brown Affidavit, ¶ 24.

48.     Other offenders had access to health care but failed to properly care for their health due to alcohol or drug addiction.  Brown Affidavit, ¶ 25.

49.     Frequently, a prison doctor is the only physician that an offender has seen in years. Brown Affidavit, ¶ 26.

50.     Moreover, security concerns must always be considered in the prison setting.  Brown Affidavit, ¶ 27.

51.     Health care is provided inside a prison with gun towers, razor wire fences, and heavy steel doors.  Brown Affidavit, ¶ 27.

52. A prison doctor's day may be disrupted by events such as an unanticipated prison "lockdown."  Brown Affidavit, ¶ 27.

53. An offender who entered prison with a drug addiction may be seeking pain medication, not to treat physical pain, but because of his addiction. Brown Affidavit, ¶ 27.

54. An offender may be requesting a cane for use as a weapon instead of as a walking aid. Brown Affidavit, ¶ 27.

55. There is also a potential for physical harm to either the prison doctor, his family or both. Brown Affidavit, ¶ 27.

56. Chance comments overheard by an offender may be used to manipulate or to extort. Brown Affidavit, ¶ 27.

57. In Dr. Brown's experience, most offenders appreciate the services that the prison doctors provide to them during their incarceration.  Brown Affidavit, ¶ 28.

58. Others lash out and, figuratively, bite the hand that is outstretched to help them.  Brown Affidavit, ¶ 29.

59. Knowing all of this, Dr. Brown is one of the few doctors who has chosen prisoners as his patients.  Brown Affidavit, ¶ 30.

60. Dr. Brown treats his patients to the best of his ability without regard to race, religion, creed, or crime against society.  Brown Affidavit, ¶ 31.

61. In fact, although there may be some exceptions such as when an offender tells Dr. Brown himself, he typically does not know the crimes for which his patients are incarcerated. Brown Affidavit, ¶ 31.

62. One of Dr. Brown's patients is the Plaintiff, Mr. Del Evans. Brown Affidavit, ¶ 32.

63. In preparation of Dr. Brown's affidavit, Dr. Brown refreshed his recollection of the Plaintiff's care and treatment by reviewing his medical records.  Brown Affidavit, ¶ 33.

64. One of the forms used by the Department of Corrections is Doc. 0090 "Offender Health Status Transfer Summary."  Brown Affidavit, ¶ 34.

65. The Offender Health Status Transfer Summary form is used whenever an offender is transferred from one prison to another.  Brown Affidavit, ¶ 35.

66. An Offender Health Status Transfer Summary form dated December 5, 2006 is included in the Plaintiff's medical records. A copy of this Transfer Summary form is attached to Dr. Brown's affidavit as Exhibit No. 1.  Brown Affidavit, ¶ 36.

67. The Plaintiff arrived at the Western Illinois Correctional Center during the evening of December 5, 2006. Brown Affidavit, ¶ 36.

68. New arrivals at the Western Illinois Correctional Center are screened by medical staff who record their findings on the bottom portion of the Offender Health Status Transfer Summary form in the section marked "Reception Screening."  Brown Affidavit, ¶ 37.

69. The licensed practical nurse ("LPN"), who screened the Plaintiff upon his arrival at Western Illinois Correctional Center on the evening of December 5, 2006 reported as follows:  (1) that the Plaintiff expressed no complaint; (2) that the Plaintiff reported that he was not currently being treated or taking any medications; (3) that the Plaintiff was alert and oriented (4) that the Plaintiff weighed 164 pounds, his temperature was 97.6°F, his pulse was 74 beats per minute, his respirations were 16 beats per minute, and his blood pressure was 102/82. Brown Affidavit, ¶ 38.

70. The nurses plan was for the Plaintiff to report to sick call on a routine basis as needed. A copy of this Transfer Summary form is attached to Dr. Brown's affidavit as Exhibit No. 1. Brown Affidavit, ¶ 38.

71. The upper portion of the Offender Health Status Transfer Summary form dated Dec. 5, 2006 is entitled "Transfer Screening" and was completed by the reception center at Stateville Correctional Center in Joliet Illinois. Brown Affidavit, ¶ 39.

72. The correctional medical technician ("CMT") who completed this portion of the form at Stateville Correctional Center on December 5, 2006, reported that the Plaintiff had experienced an acute penile discharge problem, which had been treated with Zithromax on November 20, 2006, and for which the Plaintiff was to seek routine follow-up care as needed. Brown Affidavit, ¶ 39.

73. The CMT further reported that the Plaintiff had history of alcohol and drug substance abuse, and that laboratory, dental, and mental-health screening had been conducted. A copy of this Transfer Summary form is attached to Dr. Brown's affidavit as Exhibit No. 1. Brown Affidavit, ¶ 39.

74. The Illinois Department of Corrections also uses form DOC 0084 "Offender Outpatient Progress Notes" to chronologically record patient contacts. Brown Affidavit, ¶ 40.

75. On December 5, 2006, an LPN recorded in a progress note that the Plaintiff was screened and oriented to the Western Illinois Correctional Center. A copy of this progress note is attached to Dr. Brown's affidavit as Exhibit No. 2. Brown Affidavit, ¶ 41.

76. On December 5, 2006, the LPN further recorded that blood was drawn from the Plaintiff for a routine HIV screening test. A copy of this progress note is attached to Dr. Brown's affidavit as Exhibit No. 2. Brown Affidavit, ¶ 42.

77. The following day, on December 6, 2006 at 9:40 p.m., a new entry by another LPN was made in the Plaintiff's Progress Notes. Brown Affidavit, ¶ 43.

78. The LPN recorded that the Plaintiff complained of sores in his mouth and penile drainage for the last 10 days. Brown Affidavit, ¶ 43.

79. The LPN recorded that the Plaintiff reported his face was breaking out and that he knew he had a sexually transmitted disease ("STD"). Brown Affidavit, ¶ 43.

80. The LPN observed that the Plaintiff's blood pressure was 128/72, his pulse was 68 beats per minute, his respirations were 16 beats per minute and his temperature was 95.9°F. Brown Affidavit, ¶ 43.

81. The LPN observed that the Plaintiff had raised nodules inside his lips and small areas of rash on his face. Brown Affidavit, ¶ 43.

82. The LPN's plan was to rule out ("R/O") an STD. Brown Affidavit, ¶ 43.

83. The LPN scheduled the Plaintiff to be seen during doctor sick call ("DSC") on December 18, 2006, and directed him to return to nurse sick call ("NSC") as needed ("PRN"). A copy of this progress note is attached to Dr. Brown's affidavit as Exhibit No. 2. Brown Affidavit, ¶ 43.

84. On December 9, 2006, at 1:40 p.m. a nurse noted that the Plaintiff's HIV results were given to him and that he signed for receipt of those results. A copy of this progress note is attached to Dr. Brown's affidavit as Exhibit No. 3. Brown Affidavit, ¶ 44.

85. On December 10, 2006 at 12:30 p.m., a nurse noted that the health-care unit staff were called out to the Plaintiff's residential unit. Brown Affidavit, ¶ 45.

86.   She reported that the Plaintiff had complained that he had gonorrhea and dizziness. Brown Affidavit, ¶ 45.

87.   Upon the nurses arrival, the Plaintiff stated that he had an STD with a rash on the bridge of his nose, sores in his mouth and that he needed emergency medical care.  Brown Affidavit, ¶ 45.

88.   The Plaintiff told the nurse that he could not wait to be seen at the doctor's sick call scheduled for December 18, 2006.  Brown Affidavit, ¶ 45.

89.   Nonetheless, the nurse who evaluated the Plaintiff on December 10, 2006 at 12:30 p.m. reported that his blood pressure was 124/76, his pulse was 72 beats per minute, his respirations were 18 beats per minute, and his temperature was 96°F.  Brown Affidavit, ¶ 45.

90.   The nurse reported that the Plaintiff was sitting up and appeared to be in no distress. Brown Affidavit, ¶ 45.

91.   The nurse reported that the Plaintiff had a small unopened raised area on the inner cheek in the right side of his mouth.  Brown Affidavit, ¶ 45.

92.   The nurse further reported that the Plaintiff had a small area of small bumps that were visible on the bridge of his nose.  Brown Affidavit, ¶ 45.

93.   The nurse advised the Plaintiff that there was no medical doctor scheduled to be in the healthcare unit until December 12, 2006.  Brown Affidavit, ¶ 45.

94.   The nurse then reminded the Plaintiff of the nurse sick call procedure.  Brown Affidavit, ¶ 45.

95.   The nurse noted that the Plaintiff was scheduled for medical doctor sick call on December 18, 2006, and that the Plaintiff had been directed to return to the healthcare unit as needed.  A copy of this progress note is attached to Dr. Brown's affidavit as Exhibit No. 3.  Brown Affidavit, ¶ 45.

96.   On December 10, 2006 at 9:10 p.m., a nurse noted an additional contact with the Plaintiff.  Brown Affidavit, ¶ 46.

97.   The nurse reported that the Plaintiff showed her a disciplinary ticket that he had received. Brown Affidavit, ¶ 46.

98.   The nurse reported that the Plaintiff complained about the ticket and asserted that he needed medical attention, which he claimed Stateville Correctional Center would not provide while he was there.  Brown Affidavit, ¶ 46.

99.   The nurse reported that the Plaintiff had a blood pressure of 128/74, a pulse of 76 beats per minute, respirations of 18 beats per minute and an oral temperature of 97.2°F.  Brown Affidavit, ¶ 46.

100.  The nurse reported observing some raised bumps on the bridge of the Plaintiff's nose and a small area on the inner crease of his mouth.  Brown Affidavit, ¶ 46.

101.  The nurse reported that the Plaintiff voiced no complaints of dizziness when she observed him at 9:10 p.m. that evening.  Brown Affidavit, ¶ 46.

102.  The nurse's assessment was to rule out an STD.  Brown Affidavit, ¶ 46.  The nurse reported that she reassured the Plaintiff that he would be seen and that she told him again about the nurse sick call procedure.  Brown Affidavit, ¶ 46.

103.  The nurse reported that the Plaintiff was calm.  Brown Affidavit, ¶ 46.

104.   The nurse reported that the Plaintiff thanked her for caring and for explaining things to him.  Brown Affidavit, ¶ 46.

105.   The nurse instructed the Plaintiff to return to nurse sick call as needed.  A copy of this progress note is attached to Dr. Brown's affidavit as Exhibit No. 4.  Brown Affidavit, ¶ 46.

106.   December 18, 2006 was the first time that Dr. Brown became aware of or saw the Plaintiff.  Brown Affidavit, ¶ 47.

107.   Dr. Brown saw the Plaintiff that day, while conducting the medical doctor's sick call.  Brown Affidavit, ¶ 47.

108.   Dr. Brown evaluated the Plaintiff and noted in his records that he had a blood pressure of 108/64, a temperature of 96.5°F, a pulse of 80 beats per minute, and that he weighed 171 pounds.  Brown Affidavit, ¶ 47.

109.   In the "subjective" portion of the progress note Dr. Brown recorded what the Plaintiff reported to him.  Brown Affidavit, ¶ 47.

110.   The Plaintiff told Dr. Brown that he had gonorrhea.  Brown Affidavit, ¶ 47.

111.   The Plaintiff described the usual symptoms based upon his past knowledge of urethritis.  Brown Affidavit, ¶ 47.

112.   The Plaintiff told Dr. Brown that he had contracted gonorrhea on November 16, 2006, that he had tested positive for it while at Stateville Correctional Center, but that no report had been found.  Brown Affidavit, ¶ 47.

113.   Dr. Brown noted no appreciable penile drainage during his physical observation of the Plaintiff.  Brown Affidavit, ¶ 47.

114.   Dr. Brown recorded that the Plaintiff denied being provided the antibiotic Zithromax on November 20, 2006 while at Stateville.  Brown Affidavit, ¶ 47.

115.   Dr. Brown, therefore, gave the Plaintiff Zithromax again on December 18, 2006.  Brown Affidavit, ¶ 47.

116.   Many patients with gonorrhea are also infected with chlamydia.  Brown Affidavit, ¶ 47.

117.   Thus, Dr. Brown ordered that laboratory cultures be taken from the Plaintiff's urethra to determine whether the Plaintiff had either gonorrhea or chlamydia.  A copy of this progress note is attached to Dr. Brown's affidavit as Exhibit No. 5.  Brown Affidavit, ¶ 47.

118.   Dr. Brown reviewed these laboratory results, which were negative, on December 22, 2006.  A copy of the laboratory results are attached to Dr. Brown's affidavit as Exhibit No. 6.  Brown Affidavit, ¶ 47.

119.   The Plaintiff testified during his deposition that, as of December 27, 2006, he was no longer worried about the gonorrhea.  Transcript at page 30 lines 4-10.

120.   The Plaintiff testified during his deposition that he initially requested medication for his face in January 2007.  Transcript at 32 lines 14-17.

121.   The Plaintiff is familiar with the procedure for submitting a healthcare request.  Transcript at page 31, lines 20-22.

122.   Typically, a request for healthcare goes to a correctional medical technician first.  Transcript at page 31, lines 20-25.

123.   Offenders do not just write the doctor.  Transcript at page 32, line 8.

124.   The Plaintiff did not write Dr. Brown directly either.  Transcript at page 35 lines 14-17.

125. The doctor is seen after an offender is given an appointment.  Transcript at page 32 lines 9-11.

126. On January 19, 2007, the Plaintiff was seen by a nurse for complaints of several hard pea sized bumps on his face. Brown Affidavit, ¶ 48.

127. The nurse reported that the Plaintiff' temperature was 96.6°F, his blood pressure was 110/62, his pulse was 60 beats per minute, and his respirations were 16 beats per minute. Brown Affidavit, ¶ 48.

128. The nurse noted that, according to the Plaintiff, he had had the bumps for quite awhile and that they bled when he squeezed them.  Brown Affidavit, ¶ 48.

129. During his deposition, the Plaintiff stated as follows: "I am the type of person that if I see a bump in the mirror I'm going to bust it up."  Transcript at page 29 lines 15-16.

130. The Plaintiff stated that he will squeeze any bump on his face.  Transcript at page 30 lines 16-19.

131. The Plaintiff acknowledged that he does not know whether squeezing on a pimple makes it better or worse.  Transcript at page 30 line 24 through page 31 line 2.

132. The nurse directed him to discontinue squeezing the bumps and to wash his face with soap and water twice a day.  Brown Affidavit, ¶ 48.

133. The nurse further noted that she had consulted with Dr. Brown regarding the Plaintiff's condition.  Brown Affidavit, ¶ 48.

134. Although Dr. Brown has no independent recollection of her consulting with him, he agrees with her recommendations to the Plaintiff on January 19, 2007, based upon his recorded observations of the Plaintiff approximately 1 month earlier, and the nurses' reported evaluation of January 19, 2007.  A copy of this progress note is attached to Dr. Brown's affidavit as Exhibit No. 7. Brown Affidavit, ¶ 48.

135. The Plaintiff reported no further medical concerns to medical staff until May 2, 2007, when Dr. Brown saw him again during doctor's sick call. Brown Affidavit, ¶ 49.

136. On this day, the Plaintiff indicated that he was having problems with what Dr. Brown determined to be atopic dermatitis, or in other words, an inflammation of the skin. Brown Affidavit, ¶ 49.

137. The Plaintiff stated that he was having no further urinary or penile symptoms or interrupted sleep.

138. Nonetheless, Dr. Brown ordered additional laboratory cultures to be sure that the Plaintiff did not have chlamydia or gonorrhea.  Brown Affidavit, ¶ 49.

139. Dr. Brown reviewed the results of these laboratory tests on May 7, 2007 and observed that they were still negative. A copy of the laboratory results are attached to Dr. Brown's affidavit as Exhibit No. 8.  Brown Affidavit, ¶ 49.

140. Dr. Brown provided the Plaintiff with hydrocortisone ointment to treat his skin condition and directed him to see Dr. Brown again in one month on June 4, 2007.  A copy of this progress note is attached to Dr. Brown's affidavit as Exhibit No. 9.  Brown Affidavit, ¶ 49.

141. The Plaintiff was seen next on May 27, 2007.  Brown Affidavit, ¶ 50.

142. On this date, the Plaintiff was seen by a nurse. Brown Affidavit, ¶ 50.

143. The Plaintiff stated that he was having trouble with the bumps again.  Brown Affidavit, ¶ 50.

144.    The Plaintiff' blood pressure was 128/80, his pulse was 72 beats per minute, his respirations were 16 beats per minute, and his temperature was 98.4°F.  Brown Affidavit, ¶ 50.

145.    The nurse observed that the Plaintiff had several bumps on the back of his neck and in the area of his groin.  Brown Affidavit, ¶ 50.

146.    The nurse observed that the bumps were pea size and solid to touch.  Brown Affidavit, ¶ 50.

147.    The nurse reported that the Plaintiff had a history of the bumps re-occurring every so often and that the bumps had been present for the last four days.  Brown Affidavit, ¶ 50.

148.    The nurse advised the Plaintiff to keep the areas clean and dry and to not squeeze the bumps.  Brown Affidavit, ¶ 50.

149.    The Plaintiff was further scheduled to be seen during doctor's sick call on June 1, 2007.  Brown Affidavit, ¶ 50.

150.    The Plaintiff was reassured by the nurse and advised to return to nurse sick call as needed.  A copy of this progress note is attached to Dr. Brown's affidavit as Exhibit No. 10.  Brown Affidavit, ¶ 50.

151.    On June 1, 2007, Dr. Brown saw the Plaintiff again during doctor's sick call.  Brown Affidavit, ¶ 51.

152.    Dr. Brown discussed with the Plaintiff the results of the laboratory tests and his rash.  Brown Affidavit, ¶ 51.

153.    Dr. Brown noted that the laboratory tests were all negative, and that the rash was now suppressed with the topical treatment that Dr. Brown had previously provided.  Brown Affidavit, ¶ 51.

154.    Dr. Brown's assessment was that the Plaintiff continued to have atopic dermatitis and his plan was to continue the prescription for the topical ointment to treat the rash.  A copy of this progress note is attached to Dr. Brown's affidavit as Exhibit No. 11.  Brown Affidavit, ¶ 51.

155.    The Plaintiff admitted during his deposition that Dr. Brown treated his skin condition.  Transcript at page 33 lines 16-25.

156.    The Plaintiff admitted during his deposition that Dr. Brown prescribed hydrocortisone for him.  Transcript at page 33 line 16 through page 34 line 12.

157.    The Plaintiff admitted during his deposition that Dr. Brown gave him another urine test.  Transcript at page 34 lines 13-16.

158.    The Plaintiff admitted during his deposition that he no longer has any bumps on his face, and that the medication Dr. Brown provided him is working.  Transcript at page 34, line 22 through page 35 line 4.

159.    The Plaintiff admitted during his deposition that the medication Dr. Brown provided him for the bumps cleared them up.  Transcript at page 34, line 22 through page 35 line 4.

160.    The Plaintiff admitted that on the date of his deposition, he had no complaints.  Transcript at page 34, line 22 through page 35 line 6.

161.    As evidenced by the medical records, Dr. Brown's only personal contact with the Plaintiff from the time of his arrival at Western Illinois Correctional Center, on December 5, 2006 through June 1, 2007, is as noted above.  Brown Affidavit, ¶ 52.

11

162.  Dr. Brown's treatment of the Plaintiff was based upon his judgment as a medical doctor with more than four decades of experience treating patients.  Brown Affidavit, ¶ 53.

163.  Dr. Brown's treatment decisions were based upon not only the Plaintiff' subjective complaints, but also his medical records and the objective information, including the laboratory results, that Dr. Brown obtained as part of his evaluation of the Plaintiff' symptoms.  Brown Affidavit, ¶ 53.

164.  As can be seen, the medical records indicate that the Plaintiff was provided with Zithromax on November 20, 2006 while at Stateville.  Brown Affidavit, ¶ 53.

165.  There are risks and benefits to providing medications.  Brown Affidavit, ¶ 53.

166.  For example, overuse and misuse of antibiotics can result in drug resistant strains of bacteria.  Brown Affidavit, ¶ 53.

167.  Thus, prescription medications must only be provided when medically warranted, and must be taken as ordered.  Brown Affidavit, ¶ 53.

168.  In this case, the Plaintiff' condition was treated properly as evidenced by the laboratory results which show that he no longer had the complained of gonorrhea.  Brown Affidavit, ¶ 53.

169.  Similarly, as noted above, his skin condition is controlled with topical ointment.  Brown Affidavit, ¶ 53.

170.  Attached to Dr. Brown's Affidavit are the relevant medical records relied upon when Dr. Brown provided care to Mr. Del Evans, Registration No. R12300, who Dr. Brown saw as a patient during his incarceration at Western Illinois Correctional Center.  Brown Affidavit, ¶ 54.

171.  These records are kept of regularly conducted activities in the prison and were made in the ordinary course of business by persons with knowledge of the facts set forth in the records.  Brown Affidavit, ¶ 56.

172.  Defendant Zimmerman was Warden of Western Illinois Correctional Center from February 1, 2006 until May 16, 2007. (See "Exhibit A", Affidavit of Defendant Zimmerman, ¶1, attached to defendants' memorandum of law [25]).

173.  Plaintiff is suing Defendant Zimmerman because he was the warden of Western Illinois Correctional Center when Plaintiff was transferred to the institution.  (Plaintiff's Transcript Deposition, Exhibit B, p. 52, lines 20-25, attached to defendant's memorandum of law [25]).

174.  On January 10, 2007, Defendant Zimmerman reviewed a grievance dated December 28, 2006 that was filed by Plaintiff as an emergency grievance. (Exhibit A, ¶ 5, attached to defendant's memorandum of law [25]).

175.  Defendant Zimmerman forwarded Plaintiff's grievance to the Health Care Unit Administrator for review. (Exhibit A, ¶ 6 [25]).

176.  At the time Defendant Zimmerman reviewed Plaintiff's grievance, Plaintiff had been seen by a doctor and had received medication to treat his medical condition.  (Exhibit B, pp. 22, 26, 29 [25]).

177.  Defendant Zimmerman had to rely upon licensed medical professionals to provide appropriate health care treatment to inmates at Western Illinois Correctional Center. (Exhibit A, ¶ 7 [25]).

178    If medical personnel determined Plaintiff needed medical treatment, they would have provided it to him.  (Exhibit A, ¶ 6 [25]).

179    Defendant Zimmerman was not present during any of the treatment provided to Plaintiff. (Exhibit A, ¶ 8; Exhibit B, p. 57, lines 9-12 [25]).

180.   Defendant Zimmerman did not have any personal involvement in the diagnosis treatment, or medical care Plaintiff received at Western Illinois Correctional Center, and Defendant Zimmerman was not licensed to provide medical care or treatment.  (Exhibit A, ¶ 8 [25]).

181.   Plaintiff is aware that Defendant Zimmerman is not a doctor or nurse.  (Exhibit B, p. 53, lines 2-7 [25]).

182.   Plaintiff does not think Defendant Zimmerman would have had the ability to tell a physician how to treat Plaintiff.  (Exhibit B, p. 57, lines 5-7).

183.   Defendant Zimmerman did not meet with Plaintiff to discuss the issues set forth in Plaintiff's grievance or his complaint. (Exhibit A, ¶ 9, Exhibit B, p. 53, lines 8- 13 [25]).

184.   Plaintiff stated during his deposition that Defendant Zimmerman did not retaliate against Plaintiff. (Exhibit B, p. 55, lines 22-24 [25]).

## Discussion

The court agrees with the defendants.  Here, there was no deliberate indifference to any serious medical need of the plaintiff.  The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the 8th Amendment.  *Estelle v. Gamble,* 429 U.S. 97, 104, (1976).  In order to prevail on this claim, a Plaintiff must show that his condition was "objectively, sufficiently serious" and that the "prison officials acted with a sufficiently culpable state of mind."  *Greeno v. Daley*, 414 F. 3d 645, 652-653 (7th Cir. 2005).  With respect to the first requirement, a "serious medical need" is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person could easily recognize the necessity for medical treatment by a doctor.  *Foelker v. Outagamie County*, 394 F. 3d 510, 512-513 (7th Cir. 2005).  With respect to the second requirement, i.e., the culpable state of mind, a Plaintiff must demonstrate that the prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the official actually drew that inference.  *Greeno v. Daley*, 414 F. 3d 645, 653 (7th Cir. 2005).

"Medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an 8th Amendment claim."  *Gutierrez v. Peters*, 111 F. 3d 1364, 1374 (7th Cir. 1997).  In other words, medical malpractice does not become a constitutional violation merely because the victim is an inmate, and a complaint that a physician has been negligent in diagnosing or treating a medical condition of an inmate does not state a valid claim under the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  As a result, courts must distinguish between (1) deliberate indifference to the serious medical needs of an inmate and (2) negligence in the diagnosis or treatment of the inmate's medical condition.  *Gutierrez v. Peters*, 111 F. 3d 1364, 1374 (7th Cir. 1997).  "Mere negligence or even gross negligence does not constitute deliberate indifference." *Snipes v. DeTella*, 95 F. 3d 586, 590 (7th Cir. 1996).

To prove deliberate indifference to a serious medical need, the Plaintiff must show that Dr. Brown had actual knowledge of an impending harm which was easily preventable so that a conscious culpable refusal to prevent harm could be inferred from a failure by Dr. Brown to prevent it. *Dixon v. Godinz*, 114 F. 3d 640, 645 (7th Cir. 1997); *Duckworth v. Franzen*, 780 F. 2d 645, 653 (7th Cir. 1985). In this case, the Plaintiff cannot meet his burden. Dr. Brown did not see or become aware of the Plaintiff until December 18, 2006. At the time Dr. Brown first saw or was aware of the Plaintiff, he treated the Plaintiff with antibiotics and ordered laboratory tests. The laboratory test results showed that the Plaintiff did not have gonorrhea or chlamydia when Dr. Brown first saw him on December 18, 2006. Thus, the laboratory test results unequivocally demonstrate that there was no impending harm to the Plaintiff when Dr. Brown saw him on December 18, 2006. The Plaintiff cannot demonstrate actual knowledge of the alleged harm either, because Plaintiff's medical records demonstrate that he had previously been provided with Zithromax to treat the gonorrhea on November 20, 2006. More important, the Plaintiff cannot show that Dr. Brown culpably failed to prevent any alleged harm, because Dr. Brown treated him with Zithromax again on December 18, 2006, a treatment that the laboratory results later showed was unnecessary.

Dr. Brown did not see or become aware of the Plaintiff's condition until December 18, 2006, and he cannot be held liable under Section 1983 for the action or inaction of others. When bringing a claim against a prison official under Section 1983, a Plaintiff must show that the official was "personally responsible for the constitutional deprivation." *J. H. and J. D. v Johnson*, 346 F. 3d 788, 793 (7th Cir. 2003). Thus, in order to be held liable under Section 1983, a supervisor must have "had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct." *Id.* Section 1983 does not recognize a doctrine of superiors (liability). Such a doctrine would be analogous to respondeat superior, which makes the employer, as distinct from a superior employee, liable for an employee's tort – and which is also unavailable in suits under Section 1983. *Duckworth v. Franzen*, 780 F. 2d 645, 650 (7th Cir. 1985). [S]upervisors who are merely negligent in failing to detect and prevent subordinant's misconduct are not liable, because negligence is no longer culpable under Section 1983. *Jones v. Chicago*, 856 F. 2d 985, 992 (7th Cir. 1988). *See also Crowder v. Lash*, 687 F. 2d 996, 1006 (7th Cir. 1997); *Johnson v. Snyder*, 444 F. 3d 579, 584 (7th Cir. 2006) (summary judgment for department of corrections director warranted where there was no evidence that the director personally read any of the Plaintiff's communications or had any subjective awareness of the Plaintiff's condition).

Even if the plaintiff had exhausted administrative remedies for his condition of atopic dermatitis, the defendants would be entitled to summary judgment anyway. The Plaintiff also complains about the bumps or pimples on his face, which the Plaintiff could not resist squeezing and which Dr. Brown ultimately treated with hydrocortisone. This condition was initially treated by a nurse who instructed the Plaintiff to cease squeezing the bumps and to wash the affected areas. The Plaintiff had no objectively serious medical need for a different treatment. An objectively "serious medical need" is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person could easily recognize the necessity for medical treatment by a doctor. *Foelker v. Outagamie County*, 394 F. 3d 510, 512-513 (7th Cir.

14

2005).  No physician diagnosed the Plaintiff's skin condition as mandating treatment with hydrocortisone alone without first attempting to treat the condition with instructions on better personal hygiene.  The proper treatment of atopic dermatitis is not so obvious that even a layperson could recognize what is and what is not medically appropriate.  Further, the Plaintiff cites to no case law that would indicate that pimples present a substantial risk of serious harm such that a delay in treatment would amount to the level of an Eighth Amendment violation. Assuming arguendo that the Plaintiff could show a serious medical need for different treatment of his atopic dermatitis than what was provided, he still cannot show deliberate indifference. The Plaintiff's skin condition was treated progressively by Dr. Brown and the nursing staff, first with instructions on better hygiene, and later with hydrocortisone.  Moreover, the Plaintiff admitted during his deposition that the medication prescribed by Dr. Brown for his skin condition has cleared it up.

The Constitution does not guarantee prisoners a specific medical treatment or complete freedom from symptoms after treatment.  *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (noting that it would be nice if pain would immediately cease after appropriate medical attention, but life is not so accommodating and those with the best treatment can still experience pain). The Constitution protects prisoners from deliberate indifference to serious medical needs.  *Id.*  In this case, the Plaintiff cannot demonstrate negligence, let alone deliberate indifference, by Dr. Brown.  The Plaintiff's claims appear to be based on nothing more than the Plaintiff's own confusion as a layperson with no medical training regarding the treatment that he was provided. It also appears from the facts of this case, that the plaintiff filed this lawsuit in retaliation of his receiving the disciplinary ticket.  There is simply no verifying medical evidence to support the Plaintiff's claims.  Instead, the laboratory test results from December 18, demonstrate that even when Dr. Brown first saw the Plaintiff and treated him again with Zithromax the Plaintiff was no longer positive for gonorrhea.

In conclusion, the Plaintiff has brought a claim against Dr. Brown alleging deliberate indifference in violation of the Eighth Amendment to the United States Constitution.  Under this theory the Plaintiff must show that he had an objectively serious medical need and that Dr. Brown was deliberately indifferent to that need.  The Plaintiff can show neither.  The Plaintiff was treated with antibiotics for his gonorrhea before Dr. Brown ever saw or was even aware of him.  When Dr. Brown finally saw the Plaintiff on December 18, 2006, out of an abundance of caution, he prescribed antibiotics again and ordered additional laboratory tests.  Those tests showed that, despite Plaintiff's subjective belief and medically unsupported claims to this court to the contrary, the Plaintiff was no longer positive for gonorrhea.  Moreover, there was no deliberate indifference, because Dr. Brown treated the Plaintiff as though he had gonorrhea (though in fact he did not) by again prescribing Zithromax.   Furthermore, although the plaintiff's pimples were not a serious medical needs, the plaintiff's skin condition was treated progressively by Dr. Brown and the nursing staff, first with instructions on better hygiene, and later with hydrocortisone. Thus, Dr. Brown is entitled to summary judgment.

Further, the plaintiff also claim that the remaining defendant, Roger Zimmerman, the warden, was deliberately indifferent to his medical needs in violation of the Eighth Amendment

15

for failure to provide Plaintiff with access to medical care for his sexually transmitted disease and skin condition.  The plaintiff is suing Defendant Zimmerman because the plaintiff believes Defendant Zimmerman, as warden, was responsible for the medical treatment Plaintiff received.  Prison administrators must rely on those with medical expertise to assess the needs of inmates and to prescribe treatment.  *McEahern v. Civiletti*, 502 F. Supp. 531, 534 (N.D. Ill. 1980); *see also Allen v. City of Rockford*, 349 F. 3ed 1015, 1020 (7th Cir. 2003)(Government employees are entitled to rely on a physician's determination of the best way to treat a patient).  Accordingly, a non-medical prison official is entitled to summary judgment on a claim of deliberate indifference when he or she reasonably responds to an inmate's complaint of grievance by ensuring the inmate has been evaluated by a physician and received medical care for the complained of condition.  *Johnson v. Doughty*, 433 F.3d 1001, 1010-1012 (7th Cir. 2006).  Given that Defendant Zimmerman is not a medical professional and that Plaintiff was receiving medical care Defendant Zimmerman reasonably relied on the judgment of medical staff and determined Plaintiff's medical care to be appropriate.  Therefore, Zimmerman is also entitled to summary judgment on the plaintiff's claim that he was deliberately indifferent to the plaintiff's serious medical needs.

The plaintiff alleged in one paragraph of his complaint that he received a disciplinary ticket in retaliation for seeking medical care. (Complaint, p. 4, ¶G [7]).  An act of retaliation for the exercise of a constitutionally protected right violates the constitution.  *DeWalt v. Carter*, 224 F. 3d 607, 618 (7th Cir. 1999), *citing Mt. Healthy City of School District Board of Education v. Doyle*, 429 U.S. 274, 283-4(1977).  However, the protected conduct must be a substantial or motivating factor in the retaliation action.  *Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004).  Prison officials may not retaliate against inmates for filing grievances or otherwise complaining about their conditions of confinement.  *Carter v. Illinois Dept. of Corrections*, 2007 WL 1576483, 4 (S.D.Ill.,2007).  Mereley alleging the fact of retaliation is insufficient.  *Benson v. Cady*, 761 F. 2d 335, 342 (7th Cir. 1985).  The plaintiff must allege a chronology of events from which retaliation may plausibly be inferred.  *Cain v. Lane*, 857 F. 2d 1139, 1143 f. 6 (7th Cir. 1988) citing *Murphy v. Lane*, 833 F. 2d 106, 108-9 (7th Cir. 1987).  The plaintiff failed to establish a chronology of events on the part of Defendant Zimmerman from which retaliation could plausibly be inferred. The plaintiff does not claim that Zimmerman issued the ticket, or ordered issuance of the ticket, nor does the plaintiff state who wrote the disciplinary ticket.  Further, the plaintiff admitted during his deposition that Zimmerman did not retaliate against the plaintiff. (Exhibit B, p. 55, lines 22-24)  Knowing this, the plaintiff still brought a claim of retaliation against Zimmerman.

**It is therefore ordered:**

1.       The defendant, Zimmerman's motion for summary judgment [13] is granted in part and denied in part.  Pursuant to Fed. R. Civ. Pro. 56, summary judgment is granted as to the plaintiff's claim regarding the atopic dermatitis.

2.       The defendant, Zimmerman's summary judgment motion is granted [24] and the defendant, Lowell Brown's summary judgment is granted [26].  The clerk of the court is

directed to enter judgment in favor of the defendant and against the plaintiff. Any pending matters are denied as moot, and this case is terminated, with the parties to bear their own costs.

3.      If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).

Enter this 31st day of March 2008.


                        **s\Harold A. Baker**
              _____
                        Harold A. Baker
                  United States District Judge